UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| LAURA VIDAL | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 2:13-CV-387 JD |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Laura Vidal applied for but was denied social security disability benefits by the

Social Security Administration. She then filed a complaint in this Court, seeking review of that

decision, and the matter has been fully briefed. [DE 15, 18, 23]. For the following reasons, the

Court AFFIRMS the decision of the Commissioner.

## I. FACTUAL BACKGROUND

Laura Vidal was fifty-one years old at the time of the ALJ's decision, and had worked at

a grocery store as a floral manager for about five years prior to her alleged disability. On October

8, 2010, Vidal applied for Social Security Disability Insurance Benefits, alleging an onset date of

April 1, 2008. (R.165). Her claim was denied upon initial consideration, and then again upon

reconsideration, so she filed a written request for a hearing before an Administrative Law Judge.

Vidal appeared and testified at the hearing, as did her husband and an independent vocational

expert. ALJ Edward P. Studzinski issued his decision on July 25, 2012, denying Vidal benefits

and finding that she was not disabled within the meaning of the Social Security Act. (R. 36).

Vidal requested that the Appeals Council review the ALJ's decision, but the Appeals Council

denied the request, making the ALJ's decision the final decision of the Commissioner. Vidal then

filed her complaint, and this Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

## A.    Medical History

Vidal's relevant medical history begins in 2007. Vidal saw her primary care physician twelve times in 2007, many of which were for routine checkups and refills of her medications. (R. 354–65). At her November 19, 2007 appointment, Vidal complained of headaches, so her doctor ordered an MRA and an MRI of her brain. Those were performed as outpatient procedures on December 1, 2007. The doctor's impression of the MRA was "Normal MRA of the brain," and the impressions of the MRI were "1. No acute infarct. 2. No enhancing lesions. 3. Tiny high signal areas within the periventricular white matter regions bilaterally, may be due to small vessel disease." (R. 218–19). Vidal continued to visit her doctor about monthly in 2008, and complained of headaches during four of her appointments. (R. 341–52). During many of the visits, Vidal either reported no complaints, or complained of issues such as a cough or a lump on her breast that were successfully resolved. (*Id.*). In April 2008, after the alleged onset of Vidal's disability, Vidal's physician completed a Certificate to Return to Work. He indicated that Vidal had been under treatment for anxiety, otalgia, and acute sinusitis, and that she was cleared to return to work. (R. 400). He also wrote "No" in the blanks next to "Restrictions" and next to "Light Work." (*Id.*).

In May 2009, Vidal was admitted to the hospital due to severe abdominal pain with nausea and vomiting. She was diagnosed with acute cholecystitis, and underwent a laparoscopic cholecystectomy, or removal of her gallbladder. Vidal tolerated the procedure well, and was released after spending a week in the hospital. (R. 221–23). These records also indicate that Vidal's past medical history included anxiety, among several other conditions. (R. 221). Vidal was again hospitalized in October 2009 for intractable stomach pain with nausea, vomiting, and

2

diarrhea. A treatment note on October 12, 2009 stated that Vidal's "symptoms may be irritable bowel related or infectious gastroenteritis," (R. 263), and she was subsequently diagnosed with gastritis, esophagitis, and stomach function disorder. (R. 258). Vidal's next medical record of note was nearly a year later, in September 2010, when she was hospitalized for complaints of severe chest congestion, coughing, difficulty breathing, headache, and a low grade fever. (R. 288). Her admitting diagnosis was an exacerbation of her asthma. (*Id.*). However, imaging studies of her lungs and sinuses were normal, and other tests only revealed a fatty liver. In a visit with her primary care physician the following week, Vidal noted that she had been experiencing extreme emotional highs and lows since her discharge from the hospital. (R. 321). Two weeks later, she reported that her mood swings were slightly better, and an office visit note from December 4, 2010 indicated that Vidal was feeling better but still experiencing some depression. (R. 320).

Having submitted her claim for social security benefits in October 2010, Vidal underwent a psychological consultative examination by Dr. Irena Walters on December 8, 2010. Dr. Walters observed that Vidal was alert, oriented, and cooperative, but that she was "intermittently tearful." (R. 417). Vidal stated that she "is not able to do any heavy lifting and that there is left hand weakness," but that she is able to groom, bathe, and dress herself, and to do various chores around the house. Vidal also noted that she had recently stopped drinking, but had been drinking two 12-packs of beer in a weekend, and that she had begun using marijuana about four years ago, and was using it every other day to calm her down. Vidal stated that she had hopeless/helpless feelings each week, with tearfulness every other day. She also described her anxiety symptoms as follows: "It feels like something is sitting on my chest; I can't breathe; I have shakiness, especially when I'm upset." (R. 419). Dr. Fisher's diagnoses were depressive disorder and panic

disorder without agoraphobia, with alcohol and marijuana abuse. She gave Vidal a Global
Assessment Functioning score of 60 to 65. A state agency reviewing psychiatrist then prepared
an assessment in which he found that Vidal's mental impairments were not severe. He also
analyzed Vidal's functional limitations, and found that Vidal was at most mildly limited in her
activities of daily living, social functioning, and concentration, persistence, or pace, and that she
had experienced no episodes of decompensation. (R. 438).

Vidal also underwent a medical consultative examination on December 17, 2010, with
Dr. Geoffrey Onyeukwu, a state agency medical examiner. (R. 422–24). Vidal reported a history
of asthma and irritable bowel syndrome, and reported occasional vomiting and diarrhea. The
examination of Vidal's arms showed no swelling, stiffness, or effusion, with a full range of
motion in each joint and full strength in all major muscle groups. Dr. Onyeukwu further found
"normal grip strength at 4/5 in both hands" and normal fine finger manipulative ability. Vidal
was also "able to open jar, zip/unzip and button/unbutton without difficulty," (R. 424), though
she reported to Dr. Onyeukwu that she had difficulty gripping and holding objects. The rest of
the examination was unremarkable. Under his findings, Dr. Onyeukwu stated that Vidal had
"multiple medical conditions that compromise functional capabilities," and that she "has a
history of GERD, hypothyroidism, Cholecystectomy, depression, anxiety, asthma, and irritable
bowel syndrome" and "has difficulty gripping objects and complains of loss of feeling in both
hands attributed to polyarthritis." (R. 424).

A state agency reviewing physician then prepared a physical residual functional capacity
assessment. (R. 442). He opined that Vidal could lift 50 pounds occasionally and 25 pounds
frequently, but that she had no other exertional limitations, meaning she was able to sit, stand, or
walk for six hours in an eight-hour work day, and was unlimited in her ability to push or pull. (R.

443). The reviewer also found that Vidal had no postural or manipulative limitations, but recommended that she avoid concentrated exposure to extreme heat or cold, or to fumes, odors, dusts, gases, or poor ventilation, due to her history of asthma. (R. 444–46).

Vidal was briefly hospitalized in February 2011 for complaints of chest discomfort, with a cough and episodes of vomiting and diarrhea. In March 2011, tests confirmed that Vidal had an overactive thyroid, so in May 2011, she underwent a radioactive thyroid ablation. (R. 523, 539). Vidal continued to visit her primary care physician on about a monthly basis, and in August 2011 began complaining of pain in her left thumb. Vidal was referred to a specialist, who prescribed a brace for her thumb, and an x-ray on her right wrist in November 2011 indicated "moderate arthropathy at the first carpometacarpal joint" in her left hand. (R. 633). On February 14, 2012, Vidal underwent a trapeziectomy on her left wrist, which removed a bone from her wrist, and she also received an injection to the same area on her right wrist. (R. 650–51). In a visit with her primary care physician on February 27, 2012, Vidal's doctor noted that she was "doing well" following the surgery on her wrist, that her "asthma has been well controlled since her last visit," and she was "stable on meds." (R. 565). A follow-up x-ray on May 15, 2012 on Vidal's left wrist showed "no obvious postsurgical complication" and showed that the bone was stable. (R. 624). At another visit with her primary care physician on May 29, 2012, Vidal's doctor again noted that Vidal was "doing well" following her surgery. A notation at the end of that office visit note stated: "s/p wrist surgery. [Patient] has forms to be filled for disability. [S]he is unable to use her left hand and going through PT for this now. Follows up with Dr[.] Kung." (R. 557). During Vidal's other office visits in this timeframe, she did not raise any specific complaints, except for one appointment at which she complained of cold symptoms. (R. 552, 560, 565, 570).

**B.      Hearing Testimony**

Three witnesses testified at the administrative hearing on June 26, 2012: Vidal, her husband, and a vocational expert. Vidal testified that she last worked in April 2008 as a floral manager in a grocery store, but that she quit because she was constantly getting sick and could not handle the physical demands of the job. She initially testified that she could barely do any daily activities, but acknowledged upon further questioning that she completed tasks such as getting dressed, making the bed, doing light cooking and laundry, and driving.

Vidal testified that she could barely lift 5 pounds with her left hand, and would drop things several times a day. Her pain in her right hand was typically around 2 out of 10, but was at 6 at the time of the hearing because a door that she was opening a few days prior got caught in the wind and pulled her hand. As to her right hand, Vidal testified that she could not lift 10 pounds. Vidal also testified that she suffered pain in her left shoulder and elbow, and that these limitations prevented her from activities such as cutting the grass, raking, shoveling, and mopping. She testified that this pain had been constant since a fall she experienced in 2003.

Vidal also testified that she experienced migraines three times each month, and that they last two days. When her migraines occur, Vidal takes Aleve and lies down in a dark room for a couple of hours, and she is unable to do anything else. As to her inflammatory bowel syndrome, Vidal said that she would have diarrhea two or three days a week, and that on those days she would have to use the bathroom 10 to 12 times. Upon questioning from the ALJ, however, her attorney acknowledged that there was no support in the record for IBS symptoms of that severity.[1] Vidal also testified as to her asthma symptoms that she uses her inhaler three times a

---

[1] The exchange included the following:

> ALJ:    Counsel, is there -- please direct me to any indication that she has complained of or been described as having symptoms of this severity . . . on an ongoing basis.

day, and that about every three months, she would have to use a nebulizer, which she would use for fifteen minutes at a time, every four to six hours, for about a two-week period.

As to her mental conditions, Vidal testified that she cries often, and that she experiences panic attacks at least twice a month. The panic attacks would typically occur when Vidal was in public in busy places or when she would receive phone calls from bill collectors. For example, two weeks prior, Vidal had been in Walmart filling a prescription, but it was very crowded, so she left and asked her husband to do it for her. She claimed that she had seen a psychiatrist a couple of times about a year and a half prior to the hearing, but did not pursue further treatment because she was unable to afford the copayments, which were $30 for each regular office visit and $50 for each visit to a specialist. The psychiatrist had also recommended that Vidal see a therapist, but she was unable to do that for the same reason.

Next, Vidal's husband briefly testified. He stated that Vidal's testimony was accurate, and he offered a few brief details consistent with her testimony. Finally, Dr. Leonard Fisher, an independent vocational expert, testified. The ALJ first asked Dr. Fisher a hypothetical about an individual with Vidal's age, education, and experience who was limited to medium-level work, with some other limitations on her postures, environment, and activities. Dr. Fisher responded that such an individual could perform Vidal's past work. When limited to light work, however, the individual would not be able to perform Vidal's past work. The ALJ finally added some

---

    . . .

Atty:    I don't think the frequency is mentioned in there. The, the, the diagnosis is there on page two of . . . 15F.

ALJ:    There's no question but that there is  -- there are -- . . . diagnoses of gastrointestinal [*sic*], but I'm just trying to figure out what . . . support there is of the --

Atty:    I don't think it's in there. I don't think it's in there, Your Honor.

(R. 77–78).

mental or emotional limitations and some further limitations on the individual's use of her left

hand. Dr. Fisher testified that such an individual would be able to perform several other jobs,

including inspector of electronics worker positions.

## C.    ALJ's Decision

The ALJ issued his decision on July 25, 2012. He found that Vidal met the insured status

requirements through December 31, 2013, and that she had not engaged in substantial gainful

activity since April 1, 2008, the alleged onset date. At step two, he found that Vidal's severe

impairments included asthma, arthritis to both upper extremities, carpel tunnel syndrome,

cholecystitis, residuals from a gallbladder removal, gastritis, esophagitis, irritable bowel

syndrome, anxiety and depression. At step three, the ALJ found that Vidal did not meet or equal

any listed impairment. Before proceeding to step four, the ALJ formulated Vidal's residual

functional capacity as follows:

> [T]he claimant has the residual functional capacity to perform light work as
> defined in 20 CFR 404.1567(b) with exceptions. Specifically, the claimant is able
> to lift up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk
> up to 6 hours in an 8-hour workday and sit up to 6 hours in an 8-hour workday,
> but is to be allowed to alternate positions every hour for five minutes at a time.
> She is never to climb ladders, ropes or scaffolds, but may perform other postural
> frequently. The claimant is to avoid concentrated exposure to extreme cold and
> hot temperatures, humidity, and pulmonary irritants such as fumes, odors, dusts,
> gases and poorly ventilated areas. She is also to avoid exposure to hazardous work
> environments, including work that involves driving or operating moving
> machinery, working at unprotected heights or being exposed to flames,
> unprotected large bodies of water and concentrated exposure to hazardous
> unguarded machinery such as operating a punch press or working in proximity of
> moving blades. The claimant is capable of performing frequent, but not constant
> fine manipulation, but is unable to use her left hand for forceful working
> movements. Mentally, the claimant is limited to simple, routine and repetitive
> tasks in a low stress job that involves simple decision-making, which is defined as
> being able to choose within a limited number of anticipated options; however she
> is unable to come up with created solutions to novel situations. Additionally, the
> claimant would be limited to occasional and minor changes to the work setting
> and workplace and is limited to work that requires simple judgment, which
> includes dealing with the concrete rather than the abstract and things rather than
> people. She is limited to no direct public service positions, such as dealing with

significant direct interaction with the public or with the public over the telephone. Lastly, the claimant is limited from performing jobs that are in extremely crowded or hectic environments, such as street fairs or carnivals, but is capable of tolerating brief and occasional interaction with her supervisors and co-workers as required in unskilled work.

(R. 28). Based on this RFC and the vocational expert's testimony, the ALJ found at step four that Vidal was unable to perform any past relevant work. However, he found at step five that Vidal could perform jobs that exist in significant numbers in the national economy. Accordingly, he found that Vidal was not under a disability, as defined under the Social Security Act, from April 1, 2008 through the date of his decision.

## II.  STANDARD OF REVIEW

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) This Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both

the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Furthermore, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### III. ANALYSIS

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a Listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's residual functional capacity, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

In contesting the Commissioner's denial of benefits, Vidal argues that the Commissioner erred in evaluating three of her conditions—her migraine headaches, left hand limitations, and irritable bowel syndrome—and that the ALJ made an improper determination as to the credibility of her testimony. Vidal argues that these errors affected the RFC and that as a result, the Commissioner failed to carry its burden at step five of establishing that she was capable of performing jobs that existed in sufficient numbers.

**A.      The ALJ Built an Accurate and Logical Bridge Between the Evidence and His Findings as to Vidal's Residual Functional Capacity**

The ALJ must determine an individual's RFC, meaning "what an individual can still do despite his or her limitations," SSR 96–8p, based upon medical evidence as well as "other evidence, such as testimony by the claimant." *Murphy v. Colvin,* 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted)*; see* 20 C.F.R. § 404.1529(a) (in making a disability determination, the

ALJ must consider a claimant's statements about his symptoms, such as pain, and how his symptoms affect his daily life and ability to work). In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even as to limitations that are not severe. *Id*. An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Nevertheless, an ALJ need not provide a written evaluation of every piece of testimony and evidence. *Golembiewski*, 322 F.3d at 917. Instead, an ALJ need only minimally articulate his justification for accepting or rejecting specific evidence of disability. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Vidal argues that the ALJ failed to properly conduct this analysis as to her migraines, her hands, and her irritable bowel syndrome, and the Court considers each in turn.

### 1. Migraines

Vidal first argues that the ALJ erred in evaluating her migraine headaches. However, the Court finds that the ALJ's decision on this issue was adequately supported. The ALJ specifically discussed Vidal's migraines during his step-two analysis, when he found that they did not qualify as severe impairments:

> [Vidal] has also complained of occasional headaches, but states that she only takes over the counter medication to control these headaches and an MRI of her brain was normal. (Exhs. 1F, 2F, 8F, 11F, 15F, 16F). Since her imaging studies have been normal and the intensity of her headaches appear mild since she only resorts to over the counter medication on occasion, I find that her headaches are non-severe.

(R. 25). The ALJ reiterated these considerations, though only briefly, during his RFC discussion, when he noted Vidal's testimony that she experiences about three migraines per month, but that

she "only takes over the counter pain medication and lies down in a dark room until they resolve." (R. 29).

The ALJ's characterization of the complaints of headaches as "occasional" is consistent with the record. In addition, Vidal herself testified that she only takes over the counter medication to treat her headaches, and the medical records suggest no other treatment or medication for headaches. And as the ALJ also noted later in his decision, no physician found any greater limitations.[2] (R. 34). Vidal attempts to undercut this reasoning by pointing out that her MRI did not only include "normal" findings, since it also listed "tiny high signal areas within the periventricular white matter regions bilaterally" as an impression. (R. 404). However, the state reviewing physician also characterized this as a normal MRI, (R. 444 ("12/1/07 clmt had normal MRI of brain.")), so the Court cannot find that the ALJ's use of that same characterization was erroneous.

Vidal also argues that diagnostic testing cannot necessarily reveal the frequency or severity of migraines. Vidal is correct, at least insofar as the record contains no medical opinions tying the MRI results to the presence or absence of migraines or their severity. That argument favors neither party, though, since while the ALJ's recitation of that fact does not add weight to his analysis, neither would the one potentially abnormal MRI finding cut against it. In addition, the ALJ also discussed the frequency (noting the occasional complaints in the record) and severity (noting that Vidal only used over the counter medications) of Vidal's migraines, so his analysis did not depend on the MRI results. The only evidence suggesting any greater frequency or severity—or any limitations whatsoever for migraines—came from Vidal's own testimony

---

[2] The Commissioner also notes that there is not a single reference in the medical records during the alleged period of disability to a complaint of "migraine" headaches, as opposed to complaints of headaches in general, which it argues further supports the ALJ's finding on this issue. However, since the ALJ did not articulate that reason, the Court does not consider it.

and from similar accounts by her family members, so her argument on this issue depends almost entirely on the ALJ crediting that evidence. However, as discussed in greater depth below, the ALJ gave valid reasons for discrediting this line of evidence.

As particularly applicable here, the ALJ noted in evaluating Vidal's credibility that given her "allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of greater restrictions placed or a more aggressive treatment protocol ordered by a treating doctor, yet a review of the record reveals no such restrictions or recommendations." (R. 34). Likewise, the medical records do not indicate that Vidal complained of such disabling symptoms to her doctors. Given Vidal's testimony that she experiences incapacitating migraines three to four times a month for two days each, it is not unreasonable for the ALJ to note the lack of a more aggressive treatment protocol in discrediting this testimony, and to consider the limited extent of this treatment in declining to attribute any limitations to Vidal's migraines. *See Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013) (finding that the ALJ did not err in evaluating the claimant's migraines where none of the medical records supported the claimant's testimony as to the frequency of her migraines). The Court therefore finds that the ALJ's finding on this issue was supported by substantial evidence, and that the ALJ adequately drew a logical bridge between the evidence and his conclusion.

### 2. Hands

Second, Vidal takes issue with the ALJ's analysis of her hand limitations. In analyzing this issue, the ALJ discussed the relevant medical records, including Vidal's diagnosis of bilateral arthritis in her wrists, the finding of moderate arthropathy in her left wrist in November 2011, the surgery to her left wrist and injection to her right wrist in February 2012, the x-rays in May 2012 that showed her wrist was stable with no obvious complications, and Vidal's statements that she was doing well after going through a course of physical therapy. The ALJ

also discussed the consultative medical examination during which Dr. Onyeukwu found that Vidal had full ranges of motion with normal strength in both of her hands, that her fine finger manipulative ability was normal, and that she was able to open a jar and put her clothes on without difficulty. He contrasted those findings against Vidal's report to Dr. Onyeukwu of difficulty with gripping and holding objects.

The ALJ further noted the reviewing physician's opinion that Vidal was able to engage in medium work, but only gave that opinion some weight, as he found her wrists could cause her difficulty lifting heavy objects, limiting her to light exertional work. He also discussed Vidal's testimony that she was unable to lift five pounds with her left hand or ten pounds with her right, and that she would frequently drop things, but he found for a number of reasons that Vidal's testimony was not fully credible. Ultimately, the ALJ found that Vidal's wrist conditions limited her to light work, meaning that she could lift up to 20 pounds only occasionally and 10 pounds frequently, and he also found that she was limited to frequent, but not constant fine manipulation and was unable to use her left hand for forceful working movements.

Vidal nonetheless argues that the ALJ erred by not finding even greater limitations. She first cites several pieces of evidence that could support some degree of limitation, including her report during the consultative examination of difficulty gripping, the x-ray that showed moderate arthropathy in her left wrist, and her February 2012 surgery and injection. However, the ALJ did discuss each of those pieces of evidence and considered them in including several exertional limitations in Vidal's RFC, and none of that evidence suggests that the ALJ's findings were not supported by substantial evidence. In addition, while the consultative examination took place in December 2010, prior to Vidal's surgery in February 2012, there is no indication in the record that any of the findings from that examination changed or were no longer relevant post-surgery.

Likewise for the RFC assessment completed in December 2010 by the state agency reviewing physician, there is no opinion in the record that Vidal had greater limitations than the ALJ included in her RFC even after her surgery. Since the burden is on a claimant to establish a disability, it would have been incumbent on Vidal to submit such records if her limitations after the surgery were actually greater than those otherwise reflected in the record. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."); *see Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) (stating that "a claimant represented by counsel is presumed to have made his best case before the ALJ"). The ALJ also found that the surgery appeared to have improved Vidal's condition, as the x-rays showed the bone was stable and there were no obvious complications, and Vidal reported that she was doing well, further indicating that the ALJ considered Vidal's condition both before and after the surgery, and further drawing the bridge from the evidence to his findings.

Vidal then cites one additional piece of evidence that the ALJ did not expressly discuss, and argues that the ALJ engaged in "cherry-picking." Specifically, Vidal cites the office visit note from May 2012, which the ALJ cited for Vidal's statement that she was "doing well" following her surgery, but which also contains a notation that Vidal "is unable to use her left hand." (R. 552–57). While an ALJ "cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding," *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), that is not the case here, as it appears that the reference to Vidal's ability to use her hand is simply documenting Vidal's self-reported limitations, the credibility of which the ALJ thoroughly considered. The office visit itself was unrelated to Vidal's hands, and there is no indication that the doctor conducted any testing or examination relative to Vidal's

hands. In addition, the notation at issue reads in whole, "s/p wrist surgery. pt has forms to be filled for disability. she is unable to use her left hand and going through PT for this now. Follows up with Dr Kung." (R. 557). This appears to indicate merely that Vidal had presented disability forms to be completed,[3] and that she self-reported that she was unable to use her left hand, was going through physical therapy, and was following up with the specialist for her hand. Though the ALJ did not expressly discuss this part of the note, he appears to have interpreted it similarly, as he stated in his decision that no physician had ever found Vidal to be more limited than the RFC in any respect. (R. 34).

Therefore, since this note represented only another self-reported limitation, not a finding or opinion by Vidal's doctor, the ALJ did not err in failing to expressly discuss it. *See Diaz v. Chater*, 55 F.3d 300, 307–08 (7th Cir. 1995) (finding that the ALJ did not engage in cherry-picking by failing to discuss a statement in a medical record concerning the claimant's limitations, as it appeared that the note was based upon the claimant's own statements about his limitations). And because the remainder of the ALJ's discussion is supported by substantial evidence and draws a logical bridge between the evidence and his conclusion, the Court finds that the ALJ adequately analyzed Vidal's wrist limitations.

### 3. Irritable Bowel Syndrome

Vidal next argues that the ALJ failed to adequately discuss her irritable bowel syndrome while formulating her RFC. At step two, the ALJ found Vidal's irritable bowel syndrome to be a severe impairment, but, as Vidal notes, he said little about that particular condition in his RFC analysis. However, the ALJ discussed Vidal's abdominal issues collectively, and he discussed the medical records pertinent to those conditions, which included several hospitalizations for abdominal pain with nausea, vomiting, and diarrhea. (R. 29–30). Based on those records, the

---

[3] These forms, if they were ever completed, are not present in the record.

ALJ concluded that Vidal's abdominal pain warranted various limitations, including a limitation to light work, the ability to alternate positions every hour for five minutes, avoiding concentrated exposure to hazards, and no jobs that require driving or operating moving machinery. The ALJ did not attribute these limitations to any of Vidal's abdominal conditions in particular, but he still considered the records pertinent to those conditions and articulated the limitations that he found justified based on that evidence.

The only further limitation that Vidal suggests is warranted due to her irritable bowel syndrome is based on her testimony that she would have to use the bathroom ten to twelve times a day during the two to three days a week she experienced diarrhea from irritable bowel syndrome. However, the ALJ expressly addressed that testimony, noting that Vidal testified that she "has irritable bowel syndrome two to three time per week" and that she "reports that she has up to 10-12 bowel movements per day, *but her representative admits there is nothing in the record to support this allegation*." (R. 29 (emphasis added)). Along with the ALJ's credibility analysis, discussed below, this statement clearly demonstrates the ALJ's logic in finding this testimony incredible and in declining to include any limitation in Vidal's RFC for off-task time due to her irritable bowel syndrome. Therefore, the ALJ's discussion sufficed to build an accurate and logical bridge from the evidence to his conclusion, so the Court does not find any error warranting remand as to this issue.

**B.     The ALJ's Analysis of Vidal's Credibility Was Not Patently Wrong**

Vidal finally argues that the ALJ erred in formulating her RFC because he improperly discredited portions of her testimony that, if believed, would have resulted in greater limitations. In making a disability determination, the ALJ must consider a claimant's statements about her symptoms and how her symptoms affect her daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). While subjective allegations of disabling symptoms alone cannot support a

finding of disability, *id.*, the ALJ must consider the claimant's subjective complaints, the

relevant objective medical evidence, and other factors relevant to a claimant's symptoms

including:

> (1) The individual's daily activities;
> (2) Location, duration, frequency, and intensity of pain or other symptoms;
> (3) Precipitating and aggravating factors;
> (4) Type, dosage, effectiveness, and side effects of any medication;
> (5) Treatment, other than medication, for relief of pain or other symptoms;
> (6) Other measures taken to relieve pain or other symptoms;
> (7) Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

An ALJ is not required to give full credit to every claim made by the claimant or to find a

disability each time a claimant states she is unable to work. *Rucker v. Chater*, 92 F.3d 492, 496

(7th Cir. 1996). However, SSR 96-7p provides that a claimant's statements regarding symptoms

or the effect of symptoms on her ability to work "may not be disregarded solely because they are

not substantiated by objective evidence." SSR 96-7p. Because the ALJ is "in the best position to

determine a witness's truthfulness and forthrightness . . . [the] court will not overturn an ALJ's

credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310–11

(7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504–05 (7th Cir. 2004)). However,

"an ALJ must adequately explain his credibility finding by discussing specific reasons supported

by the record." *Pepper*, 712 F.3d at 367.

Here, the ALJ provided multiple valid reasons for finding that Vidal's testimony as to the

severity and limiting effects of her conditions was not fully credible. He began by stating that, in

general, the limitations to which Vidal testified were "disproportionate to the objective findings

within the record," which is valid and supported by the record. (R. 33). For example, previously

in his decision, the ALJ had contrasted Vidal's complaint to the state agency examining

physician that she had difficulty gripping and holding objects against the physician's objective findings, which included that she had a full range of motion, normal grip strength in her hands, and normal fine finger manipulative ability, and that she was able to open a jar and put her clothes on without difficulty. (R. 31). The ALJ also noted with regard to Vidal's mental conditions that despite her claims of mood swings, her psychological consultative examination was relatively normal and indicated only mild to moderate difficulties. (R. 34).

Perhaps most persuasively, the ALJ also discussed how, given Vidal's allegations of totally disabling symptoms, "one might expect to see some indication in the treatment records of greater restrictions placed or a more aggressive treatment protocol ordered by a treating doctor, yet a review of the record reveals no such restrictions or recommendations." (R. 34). This is a legitimate point, and there are multiple examples of this in the record. For one, Vidal testified that she experienced three to four migraines a month, each of which lasted two days, and that she was unable to do anything while she experienced them. Yet, as the ALJ expressly discussed previously in his decision, Vidal treated her migraines only by lying down and taking over the counter medication. (R. 25). The ALJ cannot be faulted for questioning why Vidal would not have pursued any of the more aggressive treatments available for this condition if she was actually incapacitated for over twenty percent of her life, as she testified. Similarly, Vidal testified that she experienced diarrhea due to her irritable bowel syndrome two to three times a week, and that she had to use the bathroom ten to twelve times a day on those days. Yet, as the ALJ also noted, there are no records indicating treatment for such extreme and intrusive symptoms. (R. 29).

The ALJ also expressed in this regard that no physician had found Vidal to be limited to a greater extent than the limitations he incorporated into the RFC, and that Vidal had been released

to go back to work with no restrictions even after the alleged onset date. Again, this observation is consistent with the record, and provides a valid reason for suspecting that Vidal was exaggerating her symptoms when she testified at the hearing to multiple limitations that exceeded those found by any physician. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (noting that "a discrepancy between the degree of pain claimed by the applicant and that suggested by the medical records is probative of exaggeration"). Notably, Vidal does not challenge or address any of the above aspects of the ALJ's credibility analysis.

As additional justification for his credibility finding, the ALJ noted that although Vidal had received various treatments for her conditions, the medical records showed that her conditions had generally either improved or come under control with treatment. (R. 33). In support, he first observed that Vidal had last been treated for abdominal issues in February 2011, which was 18 months prior to the ALJ's decision. The ALJ next noted that by February 2012, Vidal's asthma was noted as stable, and her pulmonary function test was normal. Vidal argues that she was nonetheless prone to exacerbations of her asthma, but the last time Vidal had been hospitalized for any respiratory issue was over a year prior, so it was not unreasonable for the ALJ to find that her asthma had stabilized. There is also no indication that Vidal's treatment in those respects was limited by her financial condition, as she visited her primary care physician regularly throughout this time period. The ALJ also noted as to Vidal's wrist condition that she had undergone surgery to her left wrist and an injection to her right wrist, but that she had not made any further complaints about her right wrist since, and that she had reported that she was doing well with her left wrist. Vidal again argues that the ALJ cherry-picked by not also discussing the May 2012 note that Vidal could not use her left hand, but for the reasons discussed above, the Court disagrees. It is also worth noting that the ALJ did not find that the

surgery had ameliorated Vidal's wrist condition altogether—he found that she was limited to light work with other minor exertional and manipulative limitations. Rather, he merely indicated that Vidal's report that she was doing well after her surgery suggested that the surgery offered some improvement for her condition. That is a reasonable and modest inference, and offers another reason for finding that Vidal's testimony to symptoms that exceeded any limitations in the record was at least somewhat exaggerated.

The ALJ also noted with respect to Vidal's mental conditions that Vidal had received no mental health treatment[4] despite having insurance. He acknowledged that Vidal claimed a difficulty affording the copays, but he considered Vidal's "failure to aggressively pursue available treatment" as "one of the many factors" in his credibility analysis. Citing SSR 96-7p, Vidal criticizes the ALJ for considering this factor given her testimony that she had difficulty affording treatment. However, SSR 96-7p only requires an ALJ to "consider[] any explanation that the individual may provide" for their failure to seek treatment, such as an inability to afford treatment, not to *accept* all such explanations. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) Here, the ALJ did acknowledge and consider Vidal's testimony that she was unable to afford treatment, but his decision also noted that Vidal had insurance and that her husband earned $40,000 per year. It is clear from this discussion that the ALJ did not find that Vidal's difficulty paying for treatment entirely accounted for the fact that she had not aggressively sought treatment, and his weighing of that evidence is not unreasonable. In addition, the ALJ also noted that he only considered this as "one of the many factors" of his credibility analysis, so

---

[4] The ALJ was presumably referring to treatment other than by Vidal's treating physician, which he previously noted Vidal's treating physician had recommended, since the ALJ also noted that Vidal had been prescribed medication for her mental health conditions by her treating physician.

it appears he gave little weight to this factor. Thus, while his consideration of this factor was not improper, it adds relatively little weight to his analysis.

Granted, other reasons the ALJ offered either added no weight to his analysis or were improper. The ALJ noted Vidal's activities of daily living, including her ability to maintain her personal hygiene, cook, do laundry, vacuum, sweep, and drive, though perhaps only because the regulations note them as a factor relevant to evaluating a claimant's credibility. The Court agrees with Vidal that her activities of daily living were not significantly inconsistent with her testimony, and do not add any weight to the ALJ's credibility analysis. Regardless, the ALJ did not indicate how, if at all, they detracted from Vidal's credibility, so these activities may not have actually affected his credibility assessment anyway. The ALJ also stated that Vidal's drug and alcohol abuse may have contributed to her mental health conditions. But while there are indications in the record that Vidal abused drugs and alcohol, there is no medical opinion that those issues had any effect on her mental conditions, so the ALJ improperly "played doctor" as to this factor. Moreover, that Vidal's mental condition may have been caused by drug or alcohol abuse does not necessarily affect the credibility of her testimony about the limitations caused by that condition. Nonetheless, even setting aside these factors, the ALJ offered multiple valid reasons that were supported by the record and that justified discounting Vidal's credibility, so the Court cannot find that the ALJ's credibility determination was "patently wrong," as is required to overturn such a finding.[5] *Hoyt v. Colvin*, 553 F. App'x 625, 628 (7th Cir. 2014) (finding that the ALJ's credibility determination was not patently wrong where, despite improperly addressing one factor, he offered several other valid reasons for discounting the claimant's testimony).

---

[5] In addition, Vidal does not suggest that the ALJ should have included any greater mental limitations in her RFC, so to the extent the ALJ's reliance on Vidal's drug and alcohol abuse was improper, it would have only pertained to limitations that are no longer at issue.

Finally, Vidal argues that the ALJ erred in evaluating her credibility because he did not discuss her husband's testimony, which corroborated her claims as to the severity of her symptoms. Vidal cites to SSR 96-7p and 20 C.F.R. § 404.1513 and § 404.1529, which indicate that an ALJ must consider the testimony of other sources such as a claimant's spouse, and argues the ALJ's failure to discuss Vidal's husband's testimony must have been error. However, while Vidal cites to several district court opinions that have accepted similar arguments, the Seventh Circuit has repeatedly rejected this argument, noting the distinction between what an ALJ must consider and what an ALJ must discuss in the decision. An ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996). Rather, the ALJ must only "sufficiently articulate his assessment of the evidence to 'assure [the reviewing court] that the ALJ considered the important evidence and to enable [the court] to trace the path of the ALJ's reasoning." *Id.* The Seventh Circuit has held on multiple occasions that testimony by spouses or family members that "served strictly to reiterate, and thereby corroborate," the claimant's own testimony does not constitute a separate line of evidence that the ALJ must discuss. *Id.*; *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).

In those circumstances, because the ALJ's discussion of the claimant's testimony allows a court to review the ALJ's analysis of that line of evidence, the ALJ need not reiterate his credibility discussion as to the other testimony, or even discuss the other testimony at all. *Books*, 91 F.3d at 980 ("To the extent ALJ Bartelt found [the claimant's] testimony concerning his disabling pain and physical limitations to be untenable when contrasted with his reported daily activities and the relevant medical evidence, he necessarily found [the claimant's brother's] supporting testimony similarly not credible. ALJ Bartelt, therefore, did not err by declining to

address [the brother's] testimony specifically."); *Herron*, 19 F.3d at 337 ("[T]he ALJ addressed the issues raised by Herron's wife in relation to [Herron's] testimony. Thus, the ALJ did not err in failing to mention reasons for rejecting Mrs. Herron's testimony."); *see also Nelson v. Astrue*, No. 12 CV 01595, 2013 WL 2403643, at *11 (N.D. Ill. May 31, 2013) ("Plaintiff's father's testimony did not constitute a separate 'line of evidence.' *Brooks*, 31 F.3d at 980. Instead, it served strictly to reiterate, and thereby corroborate, Plaintiff's own testimony concerning his activities and limitations. The ALJ, therefore, did not err by declining to address [the father's] testimony specifically."). Here, Vidal's husband's testimony served only to reiterate and corroborate her own testimony, and therefore did not constitute a separate line of evidence that the ALJ was required to address, so the ALJ did not err by failing to discuss that testimony. Accordingly, the Court finds that the ALJ did not commit a legal error, and that his credibility determination was not patently wrong. Therefore, the Court cannot disturb the ALJ's credibility finding, and cannot vacate the Commissioner's decision on that basis.

## IV. CONCLUSION

The Commissioner's decision is AFFIRMED. The Clerk is DIRECTED to enter judgment in favor of the Commissioner.

SO ORDERED.

ENTERED: <u>March 24, 2015</u>

<u>    /s/ JON E. DEGUILIO    </u>
Judge
United States District Court